1  DAVID L. ANDERSON (CABN 149604)
   United States Attorney
2
   HALLIE HOFFMAN (CABN 210020)
3  Chief, Criminal Division

4  LEIF DAUTCH (CABN 283975)
   Assistant United States Attorney
5
        450 Golden Gate Avenue, Box 36055
6       San Francisco, California 94102-3495
        Telephone: (415) 436-7534
7       FAX: (415) 436-7234
        Leif.Dautch@usdoj.gov
8
9  Attorneys for United States of America

10                      UNITED STATES DISTRICT COURT

11                     NORTHERN DISTRICT OF CALIFORNIA

12                              OAKLAND DIVISION

13  
    UNITED STATES OF AMERICA,           )  CASE NO. 3:20-MJ-71311 MAG
14                                      )
           Plaintiff,                   )  UNITED STATES' MOTION TO
15                                      )    (1) REVOKE RELEASE ORDER AND ORDER
        v.                              )        DEFENDANT DETAINED
16                                      )    (2) TEMPORARILY STAY MAGISTRATE
    JEREMIAH JEFFERSON,                 )        JUDGE'S ORDER GRANTING RELEASE
17                                      )
           Defendant.                   )  Judge:  Hon. Edward J. Davila
18                                      )  Date:   December 3, 2020
                                        )  Time:   3:00 p.m.
19                                      )
                                        )
20                                      )
                                        )
21  _____)

UNITED STATES' MEMORANDUM RE RELEASE ORDER
3:20-MJ-71311 MAG

**MOTION TO REVOKE RELEASE ORDER AND ORDER DEFENDANT DETAINED**

On April 22, 2020, defendant Jeremiah Jefferson, a twice-convicted felon, was found in possession of a fully-loaded handgun after committing a hit-and-run car accident in Richmond, California.  A check of the National Integrated Ballistic Information Network (NIBIN) linked Jefferson's firearm to shell casings recovered at the scenes of two Bay Area shootings that had occurred just days before Jefferson's arrest.  The victim of one of those shootings described the shooter as driving a vehicle of the same make and color as Jefferson's car.  Jefferson's possession of a loaded firearm, the use of that firearm in shootings that sent at least one innocent victim to the hospital, and Jefferson's escalating criminal history demonstrate that he is not amenable to pretrial release and supervision. Because there are no conditions that can reasonably assure the safety of the community, particularly at a time when shootings and gun homicides are skyrocketing throughout the Bay Area, the magistrate judge should not have ordered Jefferson released.

**I.      Procedural History**

Jefferson is charged by complaint in this case with being a Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1).  On November 19, 2020, he made his initial appearance and was arraigned on the criminal complaint. The government moved for detention on the basis of Jefferson's danger to the public and submitted a memorandum in support of its motion on November 23, 2020.  *See* Dkt 6.  On November 27, 2020, Pretrial Services produced a pre-bail report recommending that Jefferson be detained, given the unsuitability of his two proposed sureties (his parents, both of whom have criminal records).  However, on November 30, 2020, the Hon. Magistrate Judge Jacqueline S. Corley ordered the defendant released on a $50,000 unsecured bond, signed by his parents as sureties and requiring his father also to act as custodian.  Judge Corley proposed that Jefferson be placed on the waitlist for a halfway house, be tested for COVID-19 once in the halfway house, and then be released to home confinement with his father once he received a negative COVID-19 test.  The government objected and requested a 24-hour stay of the release order, which it received to file the instant appeal.

**II.     Legal Standard**

On a bail appeal, the Court "should review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference." *United*

*States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990); *see also* 18 U.S.C. § 3145(a)(1).  The record is not limited to those facts that were presented to the magistrate judge.  Rather, this Court should "make its own 'de novo' determination of the facts," and the "ultimate determination of the propriety of detention is to be decided without deference to the magistrate's ultimate conclusion."  *Koenig*, 912 F.2d at 1193.

The Bail Reform Act of 1984 permits pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).  Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both.  *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985).  A finding that a defendant is a danger to the community must be supported by clear and convincing evidence.  18 U.S.C. § 3142(f)(2)(B).

The Court must consider four factors in determining whether the pretrial detention standard is met:  (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

**III.   Argument**

Here, all four § 3142(g) factors counsel against Jefferson's release.  Not only did he possess a fully-loaded firearm after committing a hit and run in the charged case, but his criminal history demonstrates an escalating threat of violence, culminating in his possible involvement in two shootings that put innocent members of the public in grave danger.  No conditions short of confinement can adequately mitigate that danger, and his release could further fuel the gun violence epidemic plaguing every part of the Bay Area.

UNITED STATES' MEMORANDUM RE RELEASE ORDER
3:20-MJ-71311 MAG

### A. The Instant Offense Demonstrates Jefferson's Disregard for Public Safety

The nature and circumstances of the charged offense, considered under § 3142(g)(1), weigh in favor of detention. As described further in Bureau of Alcohol, Tobacco, Firearms and Explosives Task Force Officer Zachary Trzesniewski's Affidavit in Support of Criminal Complaint, Richmond Police Officers responded to a call on April 22, 2020 about a hit-and-run car accident. The caller stated that a vehicle with tinted windows had attempted to enter an apartment building's parking lot, smashed through the security gate, crashed into two parked cars, and drove off. Officers responded to the scene, observed the damage, and saw gouges in the roadway leading away from the damaged cars. Officers followed the trail of gouges and located a black Infiniti with tinted windows that was not moving, but had the engine running. The Infiniti had major front-end damage and two flat tires.

Officers looked inside the Infiniti and saw a single occupant, Jefferson, asleep in the driver's seat. Officers knocked on the driver's side window, but Jefferson did not respond. Officers then shined a flashlight into the vehicle and saw a semi-automatic firearm wedged between the driver's seat and the center console. Upon seeing the firearm, officers opened the driver's side door and detained Jefferson.

Officers seized the firearm from inside the car. The Taurus 9mm handgun was fully loaded with a 12-round magazine and a 13th bullet in the chamber. The safety lever on the gun was off. Jefferson admitted that the damaged black Infiniti was registered to him, stated that he had recently taken a Xanax, acknowledged that he was on probation, but claimed that the firearm was not his. Jefferson's act of driving under the influence, smashing into other cars, all while keeping a fully-loaded, semiautomatic handgun at his ready disposal, evinced a clear disregard for the safety of the community.

But even more alarming, Jefferson's firearm was cross referenced in the National Integrated Ballistic Information Network (NIBIN) for possible connections to other criminal activity. As described by The National Crime Gun Intelligence Governing Board, this sophisticated technology:

> [C]reates high-resolution, digital images of the unique markings left by a firearm on expelled cartridge cases. NIBIN automatically compares captured images of these markings to all other entered casings in a specific geographic region or nationwide. The computerized process provides potential matches within hours, which are then reviewed by trained NIBIN technicians to make a final match determination. Through this process, NIBIN provides the ability to link shootings by ballistic evidence and link recovered crime guns to shootings.

The National Crime Gun Intelligence Governing Board, *Crime Gun Intelligence: Disrupting the Shooting Cycle* (Aug. 2018), https://crimegunintelcenters.org/wp-content/uploads/2018/09/CGI-Manual-Best-Practices-ATF-27-AUG-18.pdf.

Using the NIBIN database, agents connected the loaded firearm seized from Jefferson with the markings on shell casings recovered from two shootings in the days before his arrest: one in San Francisco on April 16, 2020, and one on the I-580 Highway near Castro Valley on April 18, 2020.  The San Francisco shooting involved a person in a black Infiniti sedan (matching Jefferson's car) shooting at a victim in a white car that was driving behind it.  The victim, who had injuries from being struck by broken glass from the gunfire and was transported to the hospital, reported the incident to police and believed the shooter mistook her for someone else.  The Castro Valley incident involved two vehicles shooting at each other while driving at high rates of speed on I-580.  Several nearby cars were struck by gunfire, including one person whose back window was shattered.[1]

The close proximity of those shootings to Jefferson's possession of the firearm (four and six days before, respectively), and the use of a car matching Jefferson's vehicle in the San Francisco shooting, provides strong evidence of Jefferson's involvement in those two shootings.  This, at a time when gun violence and murders are increasing at alarming rates throughout the Bay Area.  For example, San Francisco recently reported a 32% increase in recorded gunfire compared to the year before.  *Troubling Trend in S.F.: 32% Jump in Gunfire Recorded by Shotspotter Sensors*, San Francisco Chronicle, Sept. 22, 2020, https://www.sfchronicle.com/crime/article/Troubling-trend-in-San-Francisco-32-jump-in-15585017.php.  A review of the San Francisco Police Department Crime Dashboard reveals that homicides have increased by 42.9% year-over-year, driven in large part by that increase in gun violence.  *See* https://www.sanfranciscopolice.org/stay-safe/crime-data/crime-dashboard (last accessed Nov. 30, 2020).  Oakland has likewise seen a 36% increase in homicides this year over 2019, with shootings accounting for 81% of this year's homicides.  *East Oakland the Epicenter of City's Surge of Homicides Amid Pandemic*, San Francisco Chronicle, Oct. 17, 2020, https://www.sfchronicle.com/crime/article/East-Oakland-the-epicenter-of-city-s-surge-of-15654739.php.

---

[1] The government has requested confirmatory testing of the NIBIN leads and will inform the defense and the Court of any results received during the pendency of this appeal.

UNITED STATES' MEMORANDUM RE RELEASE ORDER
3:20-MJ-71311 MAG

Assaults with a firearm have increased 47.8%, while shootings at occupied homes or vehicles have increased by 44%. *Id*. Against this backdrop of exploding gun violence, the release of someone who possessed a fully-loaded firearm while driving under the influence, and whose gun is connected to not one but two recent shootings, poses an unacceptable risk to the public. Jefferson should be detained.

### B. Jefferson's Criminal History and Characteristics Also Favor Detention

Were Jefferson's criminal history limited to the charged conduct, this appeal likely would not have been taken. But his record is not so limited. Rather, Jefferson's criminal history and characteristics, and the clear danger he poses to the community, considered under §§ 3142(g)(3) and 3142(g)(4), militate in favor of detention.

In just the past two years, Jefferson has three convictions in San Francisco that each resulted in jail time:

- November 1, 2018 conviction for felony burglary (1 year jail)
- January 3, 2019 conviction for misdemeanor burglary (6 months jail)
- July 1, 2019 conviction for felony burglary (18 months jail)

Jefferson was on probation when he committed the second and third of these burglaries, and he was also on probation at the time of the instant offense. Additionally, Jefferson has been arrested at least seven other times, including unlawful firearm possession arrests in January 2020 and July 2020:

- July 17, 2016 arrest for burglary
- March 12, 2017 arrest for resisting or obstructing an officer
- May 11, 2017 arrest for attempted burglary and resisting or obstructing an officer
- August 3, 2017 arrest for burglary
- September 25, 2017 arrest for burglary
- April 7, 2019 arrest for burglary
- January 11, 2020 arrest for unlawful possession of a firearm with a large capacity magazine
- July 20, 2020 arrest for felon in possession of a firearm and ammunition

Notably, most of these arrests occurred while Jefferson was under court-ordered supervision, demonstrating a repeated refusal to abide by the law or the court's direction. Courts have recognized that Congress passed Section 922(g) to "disarm groups whose members Congress believes are unable or unwilling to conduct themselves in conformity with the responsibilities of citizenship." *United States v. Torres*, 911 F.3d 1253, 1264 (9th Cir. 2019) (internal quotation marks omitted). Jefferson has

repeatedly proven that he is either unwilling or unable to "conform[] with the responsibilities of citizenship." *Id.*

The January and July 2020 firearms arrests documented in the Pretrial Services Report are particularly concerning as they, in conjunction with the instant offense and the two shootings in April 2020, show a serious escalation by Jefferson from theft offenses to firearms offenses that pose a far greater threat to the public. That disregard for public safety—further evidenced by driving under the influence of a prescription drug and crashing into other cars—presents an unacceptably high risk to the public if Jefferson were to be released. *See United States v. Daychild*, 357 F.3d 1081, 1100 (9th Cir. 2004) (approving detention on danger prong due to defendant's possession of firearms). There are no conditions of release that can ensure the safety of the community.

### C. The Overwhelming Nature of Jefferson's Guilt Supports Detention

Finally, the weight of the evidence, under § 3142(g)(2), also favors detention. Jefferson was convicted of felony burglary in both 2018 and 2019, and he was sentenced to a jail term of 18 months for the 2019 conviction. He was still on felony probation at the time of the instant offense, which he admitted when questioned by officers after the car accident. Jefferson was alone in the car, and the handgun was clearly visible between his seat and the center console. Both the gun and ammunition traveled in interstate commerce. There can thus be no doubt about Jefferson's prohibited status, his possession of the gun, or the interstate nexus. The strength of the evidence supports detention.

### D. The Magistrate Judge's Reasons for Releasing Jefferson Were Not Supported by the Record

In granting pretrial release, the magistrate judge rejected the recommendation of Pretrial Services that Jefferson be detained. The Court appeared to do so based on two factors, neither of which are supported by the record.

First, the magistrate judge disagreed with Pretrial Service's conclusion that Jefferson's father was an inadequate surety and custodian because he had a criminal record. However, more concerning than the mere fact of the father's criminal history is the fact that he failed to disclose his two prior convictions for robbery or his prior arrests for forcible oral copulation, vehicle theft, or possession of narcotics when asked if he had ever been arrested. The existence of these offenses is troubling, but the

father's failure to be candid with Pretrial Services about his criminal history (purportedly because he thought he did not have to report old convictions) undercuts his suitability to act as a surety or custodian for Jefferson. The proposed placement with his father is even more problematic given that Jefferson reported to Pretrial Services that he is associated with the Eddy Rock gang in the Western Addition neighborhood of San Francisco, and his father's home on Fulton Street is in or around the territory of the Eddy Rock gang. Jefferson also asked during the detention hearing if he would be able to leave home confinement to attend the funerals of friends who had recently been killed. While defense counsel later asserted to Pretrial Services that his client had merely been arrested on a prior occasion with a co-defendant who was a member of the Eddy Rock gang, the specter of Jefferson's renewed association with Eddy Rock gang members in the immediate neighborhood around Jefferson's proposed placement further demonstrates the unsuitability of his father as a surety and custodian.

Second, the magistrate judge appeared swayed by Jefferson's claim to Pretrial Services that he suffers from asthma, which the magistrate judge noted can be a risk factor for COVID-19. However, the CDC has issued guidance that only those with moderate-to-severe asthma face an elevated risk from COVID-19. *See* Centers for Disease Control and Prevention, *COVID-19 Fact Shee*t, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#asthma (last accessed Nov. 30, 2020). Jefferson presented no evidence that he suffers from moderate or severe asthma, as opposed to the two lower classifications of intermittent or mild persistent asthma, and the government's suggestion of a medical evaluation to determine that was rejected. The information that *was* presented at the hearing rebuts any claim of moderate or severe asthma. Jefferson's father mentioned that Jefferson had to stay in the hospital for an extra week when he was born due to low oxygen levels, suggesting that this has been a lifelong issue, not a recent development. But his father then offered that Jefferson attended a specialized athletic high school in the East Bay; Jefferson likewise reported a knee injury from playing football. Such strenuous physical activity, during the time when Jefferson purportedly suffered from asthma, is inconsistent with a diagnosis of moderate-to-severe asthma, where symptoms interfere with daily activities and "severely limit daily physical activities." *See* University of Michigan Health System, *Classification of Asthma*, https://www.uofmhealth.org/health-library/hw161158 (Last accessed Nov. 30, 2020). Instead,

Jefferson's reported symptoms and physical activity are more consistent with a diagnosis of intermittent or mild asthma, neither of which pose elevated risks to COVID-19. As such, any reliance on asthma as a reason for releasing Jefferson is unwarranted.

Because there are no conditions of release that could reasonably ensure the safety of the community, and no pressing medical need for release, the United States requests that Jefferson be detained.

## Motion to Temporarily Stay Magistrate Judge's Order Granting Release

On November 30, 2020, Magistrate Judge Corley ordered the defendant released, with conditions, on a $50,000 unsecured bond, signed by two sureties and requiring that one of the sureties also be a custodian. Judge Corley proposed that Jefferson be placed on the waitlist for a halfway house, be tested for COVID-19 once in the halfway house, and then be released to home confinement with his father once he received a negative COVID-19 test. Upon the government's request, Magistrate Judge Corley stayed the release order for 24 hours, until 2 p.m. on December 1, 2020.

The government has requested a hearing before this Court on December 3, 2020. Although Judge Corley's order does not contemplate immediate release, to avoid any premature release of defendant before this Court has had the opportunity to review Magistrate Judge Corley's release order, the United States requests that the release order be stayed until December 3, 2020, or until whatever date this Court sets for the detention hearing.

DATED: December 1, 2020

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

*/s/ Leif Dautch*
LEIF DAUTCH
Assistant United States Attorney

UNITED STATES' MEMORANDUM RE RELEASE ORDER
3:20-MJ-71311 MAG

DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

LEIF DAUTCH (CABN 283975)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7534
    FAX: (415) 436-7234
    Leif.Dautch@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:20-MJ-71311 MAG |
| Plaintiff, | [PROPOSED] ORDER STAYING ORDER GRANTING RELEASE OF DEFENDANT |
| v. | |
| JEREMIAH JEFFERSON, | |
| Defendant | |

For good cause shown, the United States' application for a stay of Magistrate Judge Jacqueline S. Corley's order granting release to defendant Jeremiah Jefferson in the above-captioned case is GRANTED. The release order is STAYED until December 3, 2020, or until such time as the parties appear before this Court. It is further ORDERED that defendant is to remain in the custody of the United States Marshals Service until further order of this Court.

DATED:

                                                  HONORABLE EDWARD J. DAVILA
                                                United States District Judge