STEVEN G. KALAR
Federal Public Defender
Northern District of California
DAVID W. RIZK
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:  (415) 436-7700
Facsimile:  (415) 436-7706
Email:  David_Rizk@fd.org

Counsel for Defendant JEFFERSON

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JEREMIAH JEFFERSON,<br><br>Defendant. | **Case No.:** CR 19-00653 JD<br><br>**OPPOSITION TO GOVERNMENT'S APPEAL OF MAGISTRATE JUDGE'S BONDED RELEASE ORDER**<br><br>**Court:**  Hon. Edward Davila<br>**Date:**  December 3, 2020<br>**Time:**  2:45 p.m. |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... i

INTRODUCTION ........................................................................................................................ 1

FACTUAL BACKGROUND ....................................................................................................... 3

    I.      Mr. Jefferson's family background, residential history, educational and employment record. ................................................................................................................... 3

    II.     Mr. Jefferson's criminal history consists of theft-type convictions and no violence whatsoever; the instant felon-in-possession charge is by far the most serious allegation against him. ................................................................................................................. 5

LEGAL STANDARD .................................................................................................................. 7

    I.      Mr. Jefferson is not a danger to the community, and any risk can be mitigated by the strict conditions imposed by Magistrate Judge Corley. .................................................. 8

    II.     Mr. Jefferson has never missed a court date, is not a credible flight risk, and his sureties and live-in custodian, coupled with lockdown, will ensure he appears for all court dates. ..................................................................................................................... 12

    III.    Mr. Jefferson's father is an excellent surety and custodian, as Magistrate Judge Corley correctly found after questioning him. ................................................................. 13

    IV.    Mr. Jefferson's severe asthma puts him at particular risk of serious illness or death should he contract COVID-19, which further counsels in favor of release. .................. 14

CONCLUSION ........................................................................................................................... 15

# TABLE OF AUTHORITIES

**Federal Cases**

*Securities and Exchange Comm'n v. World Capital Market, Inc.*,
   864 F.3d 996 (9th Cir. 2017) .................................................................................... 8

*U.S. v. Robinson*,
   733 F. Supp. 280 (N.D. Ill. 1990) ............................................................................... 15

*United States v. Barnett*,
   986 F. Supp. 385 (W.D. La. 1997) .............................................................................. 7

*United States v. Gebro*,
   948 F.2d 1118 (9th Cir. 1991) ..................................................................................... 7

*United States v. Hir*,
   517 F.3d 1081 (9th Cir. 2008) ..................................................................................... 7

*United States v. Leyba*,
   104 F. Supp. 2d 1182 (S.D. Iowa 2000) ..................................................................... 10

*United States v. Motamedi*,
   767 F.2d 1403 (9th Cir. 1985) ..................................................................................... 8

*United States v. Santos-Flores*,
   794 F.3d 1088 (9th Cir. 2015) ..................................................................................... 7

*United States v. Temkin*,
   797 F.3d 682 (9th Cir. 2015) ....................................................................................... 8

*United States v. Youn*,
   2020 WL 4465452 (N.D. Cal. Aug. 4, 2020) ............................................................ 14

**Federal Statutes**

18 U.S.C. § 3142 .................................................................................................................. 7

# INTRODUCTION

Defendant Jeremiah Jefferson was arrested last April on the instant felon-in-possession charge. When he was arrested, he was cooperative and forthcoming with the officers. He admitted he had taken a Xanax (for the first and only time in his life), which made him sleepy and caused him to lose control of the car he was driving, which veered off the road in a minor collision. Nobody else was involved or hurt. A gun was found in the car, and Mr. Jefferson told the officers it did not belong to him. The County charged Mr. Jefferson with felon-in-possession since he several prior burglary convictions (he has no prior convictions for any violent offenses or gun crimes). He was released by the Superior Court on his own recognizance, and wisely went home to his family to get support and to live with his father (his proposed surety and custodian), his grandmother, and his auntie. Although Mr. Jefferson had been "couch-surfing" at the time of his arrest for a month or so, prior to that Mr. Jefferson had been living in the family's apartment in the Fillmore district of San Francisco for approximately five years. Mr. Jefferson, age 23, is a high school graduate, a lifelong resident of Northern California, and has a history of regular work since he graduated several years ago. He has a very close relationship with his father, and daily contact with his mother, who lives in Seattle and also agreed to act as a surety. Mr. Jefferson also has a positive long-term relationship with his girlfriend (who would also be willing to act as an additional surety if needed) and her daughter.

Since the underlying April arrest, Mr. Jefferson has made every state court hearing, and remained in regular contact with San Francisco probation officer, who reports he is in good standing. Significantly, with the support and assistance of his father, Mr. Jefferson also obtained a job at Tesla, where he had been working on the assembly line fulltime for several months up until late November, when the U.S. Attorney's Office decided to re-charge him and re-arrest him for the same conduct that occurred back in April. When he was arrested on the federal warrant during his commute to work on BART, notably, his first call was to his probation officer, who in turn notified his family. Responsibly, Mr. Jefferson also notified his employer that he had been arrested and had to go back to court and his family is working to ensure that he can return to Tesla to work eventually. His family and his probation officer all report that Mr. Jefferson has been on a positive trajectory since April and

is doing extremely well. Magistrate Judge Corley credited this positive track record when she ordered Mr. Jefferson released on strict conditions. She also shared the defense's serious concern for Mr. Jefferson's health in Santa Rita Jail because he has severe asthma—a COVID-19 risk factor—and has not yet received an inhaler in the jail, despite reporting difficulty breathing at night and repeated medical requests.

The government's primary reason for objecting to Mr. Jefferson's release is its speculation that the gun is tied to two other shootings in April that involved cartridges manufactured by Luger, the same manufacturer of rounds found in the car with Mr. Jefferson. In one of the incidents, a witness reported that she believed a car involved was a similar model and color to the one Mr. Jefferson drove off the road. In the other incident, there is no connection to Mr. Jefferson other than a few cartridges made by the same manufacturer. That is the sum total of the government's evidence. Although the government has apparently been investigating these matters for many months and local law enforcement even obtained multiple warrants, including for a cellular phone, carrier records, and pen trap and tracing information for some other suspect, it has not arrested or charged Mr. Jefferson in connection with either incident. In the meantime, the government allowed him to go about his life, living with his family and working fulltime—seriously undermining its sudden assertion now, many months later, that he is a serious danger to the community. To be clear: there is no ballistics or other forensic evidence to suggest the same gun or Mr. Jefferson was involved, or even any photographs of the casings at issue; no witness has identified Mr. Jefferson as being involved; no cellular evidence places Mr. Jefferson at either shooting; and, although the government has identified some of the people involved in those shootings, it has not identified any link between them and Mr. Jefferson. Indeed, despite repeated requests from the defense, the government has redacted all of the names and much of the evidence in the police reports concerning those other shootings, denying the defense a fair opportunity to fully investigate them.

This is not a presumption case. Under the Bail Reform Act, Mr. Jefferson must be released unless no combination of release conditions can guarantee he is safe and will appear for court. There is no credible concern here about flight risk, and it is *the government's burden* to prove by clear and convincing evidence that Mr. Jefferson is a danger to the community. On that question, under the

law, any doubts must be resolved in Mr. Jefferson's favor. Here, the government falls far short of sustaining its burden. Pretrial Services correctly concluded that any flight or safety risk could be mitigated with suitable sureties. Magistrate Judge Corley, a very experienced and careful jurist, considered all of the government's evidence and arguments and heard extensively from Mr. Jefferson's family. While understandably concerned about the shootings, she concluded that Mr. Jefferson would be quite safe at home on a $50,000 bond with very strict conditions (lockdown, for now) under the close watch of his family. Rizk Decl., Ex. A (proposed bond). She also found that his particular vulnerability to COVID-19 as an asthmatic weighed heavily in favor of his release. This was the right call and it should be affirmed.

## FACTUAL BACKGROUND

### I. Mr. Jefferson's family background, residential history, educational and employment record.

Mr. Jefferson was born to Sheldon Jefferson and Jasmine Lache Jackson in Chico, California on September 2, 1997. Pretrial Services Report ("PT") at 1. Thankfully, his family is tight and supportive. Mr. Jefferson is the youngest sibling in his immediate family. He has older two sisters, who live in Seattle and Chico, respectively, with whom he has strong relationships and weekly contact. *Id.* He also has an older brother in Oroville, California, with whom he also speaks weekly. *Id.* During his childhood, Mr. Jefferson lived primarily in Sacramento, Chico, and the Bay Area, moving from time to time between them with his mother. *Id.* As a child, Mr. Jefferson suffered a fall that resulted in a traumatic brain injury that left him with early childhood seizures as well as some enduring learning disabilities and emotional issues, although he has never been diagnosed with depression or any other formal mental health condition. PT at 5. Throughout his life, his family has ensured that he received treatment for these issues. *Id.* Mr. Jefferson was candid in sharing all of this information with Pretrial Services, and his father verified the information. *Id.*

Significantly, as a child, Mr. Jefferson also developed asthma. *Id.* His father characterizes it as severe and noted to counsel that Mr. Jefferson's girlfriend often hears him wheezing at night. Mr. Jefferson reported to Pretrial Services during his interview that he had had difficulty breathing at night at the jail and had requested an inhaler from the jail medical staff but had not yet received one.

*Id.* Defense counsel alerted the U.S. Marshals to the issue last week, but as of this filing, there is no indication Mr. Jefferson has received his inhaler. Rizk Decl. ¶ 5.

When Mr. Jefferson was approximately 14 years old, his mother Jasmine moved to Seattle because her partner had obtained employment in the Seattle area. Mr. Jefferson elected not to move with her, and he instead moved in with his father and his father's extended family at 590 Fulton Street, Apartment J, in San Francisco. This was a difficult transition for Mr. Jefferson, and it was compounded by the subsequent loss of his maternal grandmother, with whom he had been particularly close. To cope, Mr. Jefferson began seeing a therapist for some time, according to his father.

Despite these health challenges, Mr. Jefferson did well in school with his father's support. His father reports that he received mostly A's and B's in school and excelled in his studies. He played football, as well. PT at 5. Mr. Jefferson graduated from Galileo High School in 2016. *Id*. Following high school, he immediately got a job working in construction fulltime from 2016-17. PT at 4. Subsequently, in 2018 and 2019, he worked a series of jobs at the San Francisco Academy of Sciences, UPS, and Imperfect Foods. *Id.* Between jobs for several years, he also worked off and on at his father's barber shops. *Id.* On September 5, 2020, he obtained a job at Tesla working on the assembly line in Fremont, California. *Id.* He was working fulltime for Tesla up until the time of his arrest on the federal warrant. As of this filing, he has not been let go from that position and his family believes, based on discussions with his supervisor, that he could eventually return to his job at Tesla, should be released. His father reports to counsel that Mr. Jefferson has a good relationship with his supervisor at work. As noted above, Mr. Jefferson was on his commute to work on BART when he was arrested on the federal warrant in late November. Admirably, his first call was to his state probation officer, with whom he maintains regular contact and a good relationship. Portman Decl. ¶¶ 3-4. His probation officer called his father (the two of them also speak regularly) to let the family know. Mr. Jefferson also immediately notified Tesla that he been detained and brought back to court. His father noted to defense counsel that his son is remarkably honest and forthcoming.

**II.   Mr. Jefferson's criminal history consists of theft-type convictions and no violence whatsoever; the instant felon-in-possession charge is by far the most serious allegation against him.**

Following high school, Mr. Jefferson began to have some trouble with the law. In particular, starting in 2016 to 2017, he was arrested several times for shoplifting and burglary. PTS at 6. These culminated in two felony convictions for second degree burglary on November 1, 2018, and July 1, 2019, and a misdemeanor conviction for misdemeanor second degree burglary on January 3, 2019. PTS at 7-8. (*Note* that the formatting of the Pretrial Services Report lists the felony convictions repeatedly, which incorrectly gives the impression that there were more than three convictions. Not so: the dates of conviction are all the same and his rap sheet reflects the same.) The Pretrial Services Report indicates that Mr. Jefferson has never missed a court date in his life or suffered a bench warrant for a failure to appear. PT 6-8. He has also never been arrested or charged for a violent crime. *Id.* Nor has he ever been to prison. To his credit, Mr. Jefferson candidly admitted to Pretrial Services that he was a co-defendant in one of his burglary cases with an associate of a street gang that claims the area near where he grew up in the Fillmore district of San Francisco, but it is undisputed that he himself has never otherwise associated with street gangs and is not a member of any gang. PT at 9.

Thankfully, Mr. Jefferson has also never used hard drugs. PT at 6. He does smoke marijuana and used Percocet recreationally in the past before he started dating his girlfriend, and as an indication of his maturity, he would welcome assistance in his effort to quit smoking. He successfully completed substance abuse classes previously in 2018-19, and with the support of his family, Mr. Jefferson would be an excellent candidate for further counseling. PT at 6.

At the time of his arrest in this case, Mr. Jefferson was not living with his family in their apartment on Fulton Street. He had been bouncing around with his brother and acquaintances for approximately one to two months, with no stable place to live. On April 22, 2020, he was arrested by Richmond police. According to the police reports, Mr. Jefferson stated he had taken a Xanax pill (he acknowledged this to Pretrial Services, PT at 6), and never having taken one before, he became drowsy and lost control of the vehicle, a black Infiniti coupe, which ran off the road. The police reported that they found Mr. Jefferson asleep in the car. Nobody else was present and nobody was injured, thankfully. Mr. Jefferson was cooperative and forthcoming with the officers. He

acknowledged taking a Xanax, as well as being a felon on probation, but told them the gun did not belong to him. The police reported they found it between the driver's seat and the center console and that it was loaded with rounds manufactured by Luger with various different head stamps. The government has not produced any photos of the vehicle, the firearm, or the ammunition. The gun was swabbed for DNA but the government has not produced any results to suggest that Mr. Jefferson touched the gun. Mr. Jefferson was charged with a probation violation and for being a felon-in-possession of a firearm. He was released on own recognizance by the Superior Court and has attended all of his state court dates—approximately half a dozen appearances, according to his state counsel—since that time without any problems. Rizk Decl. ¶ 6.

The government raises concern about a January 2020 arrest, purportedly for firearms, that was dropped without charges. *See* PT at 8. The government has not bothered to provide any information about that arrest. Mr. Jefferson's father, however, believes that arrest relates to the following incident: Mr. Jefferson was visiting a friend's house when the police arrived and searched the house, looking for somebody else who was not at home. They searched the missing person's bedroom and found a firearm. Mr. Jefferson was not aware of the firearm, but the police nevertheless booked him, as well as his friend and two women also visiting, for firearm charges. After a DNA swab of the gun came back negative as to Mr. Jefferson, the case was completely dropped. Mr. Jefferson's probation officer confirmed these facts and also noted that although he had initially violated Mr. Jefferson for the incident, he withdrew the alleged violation after Mr. Jefferson was cleared of wrongdoing. Portman Decl. ¶ 2.

Finally, the government also raises concern about a July 2020 notation in the Pretrial Services Report related to firearms. *See* PT at 8. It has again neglected to follow-up with a records request or anything other than speculation. That notation reflects the institution of the state case for the April 2020 arrest, which is also the basis of this prosecution. The case numbers listed in his rap sheet are identical for the April and July notations, and Mr. Jefferson's state counsel confirmed the timing of the state case. In other words, and contrary to the government's rudimentary misreading of his rap sheet, the *only* criminal conduct Mr. Jefferson is alleged to have engaged in during the last year and half (since April 2019) consists of the instant felon-in-possession charge, which of course has not yet

DEFENDANT'S OPPOSITION
*JEFFERSON*, CR 19–00653 JD

been proven. PT at 8.

## LEGAL STANDARD

Prior to a conviction, the Bail Reform Act of 1984 requires a court to release a person charged with an offense pending trial, "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). If the Court does not believe that a person's pretrial release on his or her own recognizance will assure the person's appearance or the safety of the community, the Court should impose the "least restrictive further condition, or combination of conditions" necessary to mitigate the risks of nonappearance or danger to the community. 18 U.S.C. § 3142(c)(1)(B). The government bears the burden of proving by clear and convincing evidence "that a defendant is a danger to any other person or the community." *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). "To find danger to the community under this standard of proof requires that the evidence support such a conclusion with a high degree of certainty." *United States v. Barnett*, 986 F. Supp. 385, 403 (W.D. La. 1997) (ordering release of defendants charged with murder for hire). "Only in rare circumstances should release be denied, and doubts regarding the propriety of release are to be resolved in favor of the defendant." *United States v. Santos-Flores*, 794 F.3d 1088, 1090 (9th Cir. 2015). Under the Bail Reform Act, the factors to be considered include:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . .
> (2) the weight of the evidence against the person;
> (3) the history characteristics of the person, including (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g). Importantly, the weight of the evidence against the defendant is the least important factor. *Hir*, 517 F.3d at 1090. "[T]he statute neither requires nor permits a pretrial determination of guilt." *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991). "The Fifth and Eighth Amendments' prohibitions of deprivation of liberty without due process and of excessive bail

require careful review of pretrial detention orders to ensure that the statutory mandate has been respected." *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985).

Finally, although Mr. Jefferson's sureties will endeavor to be present at the upcoming hearing on December 3, 2020, the Court should consider deferring to the credibility determinations made by Magistrate Judge Corley after questioning and observing the testimony of Mr. Jefferson and his family during the original bail hearing. Generally, the Magistrate Judge's determinations concerning credibility are entitled to substantial deference, and Magistrate Judge Corley is of course very experienced in evaluating defendants, proposed sureties, and making bail determinations. *See, e.g.*, *Securities and Exchange Comm'n v. World Capital Market, Inc.*, 864 F.3d 996, 1006 (9th Cir. 2017) (noting that court that heard testimony from witnesses "was in the unique position to evaluate" their credibility); *United States v. Temkin*, 797 F.3d 682, 691 (9th Cir. 2015) (generally requiring deference to "credibility determinations made by the factfinder"). Here, she conducted an hourlong hearing and heard at length from Mr. Jefferson, his mother, and his father.

## ARGUMENT

**I.   Mr. Jefferson is not a danger to the community, and any risk can be mitigated by the strict conditions imposed by Magistrate Judge Corley.**

In the run of cases, Mr. Jefferson easily qualifies as the type of defendant who would ordinarily be released on bail in federal court, were it not for the government's unsupported allegations concerning the other two shootings, for which he was never charged or even arrested. Mr. Jefferson has a supportive family, a high school diploma, and an admirable work history. His criminal history consists of property crimes *only*, spanning just a few years. He has never been convicted of any violent or weapons-related charge. He has never been to prison. He is not a member of a street gang.[1]

---

[1] The government's speculation concerning the "specter of Jefferson's renewed association with Eddy Rock gang members" is unsupported and makes no sense. Again, it is the government's burden to show dangerousness, and there is not a shred of evidence of Mr. Jefferson's membership in any street gang. His candid concession he wound up as a co-defendant with a member in an unrelated burglary case is an indication of his candor. If the government has evidence he is in a street gang, it should have proffered it. There is none. More to the point, Magistrate Judge Corley ordered Mr. Jefferson to stay at home, so there is no prospect of him associating with gang members. The government related claim that he also should not be released home because he lives in an area with known gang activity, and has himself on *one occasion* gotten mixed up with somebody allegedly involved, borders on meritless.

DEFENDANT'S OPPOSITION
*JEFFERSON*, CR 19–00653 JD

8

He did not threaten anyone in this case—other than himself, when he nodded off and drove the car off the road. Even after that lapse, he was completely forthright and cooperative with the arresting officers. Compared to most probationers, he has been unusually honest and communicative with his assigned probation officer. Relative to most criminal defendants before this Court, Mr. Jefferson also has minimal mental health issues and only casual drug use—of marijuana. Significantly, he has taken stock of these issues on his own and is addressing them. With the help of his family, Mr. Jefferson recently decided to see a therapist on his own, *see* PT at 5, and he has a track record of successfully completing drug counseling in the past. PT at 6.

There is also a strong record to support the conclusion that since April, Mr. Jefferson has been very successful in taking care of himself and contributing to the community and is no longer even arguably a threat to anyone. He has been living at home with his family, who reports that they have noticed a significant and important change in his outlook and attitude. Rizk Decl., Ex. B (Ltr. from S. Jefferson) & Ex. B (Ltr. from J. Jackson). Importantly, on his own volition and with his father's support, he found an excellent job at Tesla, which has provided him with fulltime work for the last several months. He has been contributing to household bills, such as groceries, etc. PT 5. at His father reports that his job is very important to Mr. Jefferson because it points the way to a better future—so his family has been working to ensure that he can eventually return to Tesla if he is released and with the Court's permission (for now, Magistrate Corley ordered him on lockdown, with the possibility that he could return to work in the future). In addition to strengthening his relationship with his father, mother, and siblings, Mr. Jefferson has also deepened his commitment to his girlfriend. They hope to marry. In the meantime, he has been helping to support financially his girlfriend's six-year-old daughter by covering expenses of several hundred dollars per month. PT at 5. His girlfriend is also working fulltime, training to become a nurse, and Mr. Jefferson's father reports that she is a positive influence on Mr. Jefferson and close to their family. It is within this broader context that Magistrate Judge Corley correctly concluded, contrary to the government's suggestion, that Mr. Jefferson would actually be healthiest, safest, and best supported, on lockdown at home with his family in their apartment, rather than at a halfway house or in the jail. Rizk Decl., Ex. D (Tr. of Nov. 30, 2020 proceedings) at 34:13 (Magistrate Judge Corley: "I actually think, that being at home with

his dad as custodian is safer than putting him in a halfway house where he's with other people that are a bad influence."). This safety network, coupled with supervision from Pretrial Services, and the strong incentive Mr. Jefferson has to comply with his conditions of pretrial release for the sake of his pending federal case, *amply* mitigate any potential risk to the community.

It is against this backdrop that the Court must evaluate the government's claim that the gun or vehicle involved in Mr. Jefferson's April 2020 arrest may have been involved in other shootings from the same time period. Mr. Jefferson adamantly denies any involvement in either episode, and the fact is that law enforcement has had many months to investigate those shootings and remains unable to adduce probable cause to believe that Mr. Jefferson was associated with either one. Again, he has not been charged or even arrested. That is so because the evidence the government has provided is entirely circumstantial and, at bottom, just very weak. As noted above, it is also incomplete: despite repeated requests for full disclosure, the government still has not produced unredacted police reports from these incidents which would allow the defense to investigate them fully. Nevertheless, even on the current record, it is clear that the government has no direct evidence whatsoever to place him personally at the scene of either event—and certainly no viable case against Mr. Jefferson for either incident. As the Court is no doubt aware, prior *arrests* for conduct that is unproven are due considerably less weight under the Bail Reform Act than prior *convictions*, and generally do not support a finding of dangerousness. See, e.g., *United States v. Leyba*, 104 F. Supp. 2d 1182, 1184 n.2 (S.D. Iowa 2000) (prior arrest does not provide basis for clear and convincing determination of dangerousness). Alleged conduct that is not even the subject of any *arrest*, let alone a *conviction*, should not be afforded much weight at all. The government cites no authority to the contrary.

The primary link relied upon by the government is that fragments of casings found at those two shootings were manufactured by Luger, the same manufacturer of rounds found in the car with Mr. Jefferson. Even as to the fragmented casings themselves, there is no evidence that they had identical Luger head stamps to the rounds found with Mr. Jefferson. Thus, the *only* connection is the manufacturer—an incredibly weak link. The government's own discovery concerning this supposed link is a database relational hit, described in an email circulated among law enforcement and forwarded to the U.S. Attorney's Office back in August (there is no report or technical analysis). The

email itself includes an important warning: "These results are *preliminary and tentative*, pending completion of the technical review process. *A NIBIN Lead does not constitute an identification, and a laboratory request must be submitted for microscopic comparison of the evidence for confirmation*." (emphasis added). Despite the time and opportunity to do so, government has not provided any laboratory reports, any ballistics, or other forensic evidence to link the gun apparently found with Mr. Jefferson to those other casings, which were found in disparate locations around the Bay Area (Mr. Jefferson was arrested in Richmond, the other two shootings occurred in San Francisco and Castro Valley). Indeed, the government has not even bothered to produce any photographs of any the casings involved, the gun, or the car in which Mr. Jefferson was found. Although it is at pains to describe in the abstract the "sophisticated" technology supposedly employed by its databases, there is no indication any of the actual technical work was completed in this case. Moreover, even if it had done its homework, as the Court is no doubt well aware, this type of "tool marking" forensic evidence has been repeatedly and thoroughly debunked by courts for many years now.

In addition to the casings, the government also relies on a witness statement asserting that the San Francisco shooting involved a similarly colored model of car to the one Mr. Jefferson was found in at the time of his arrest. The witness—whose name is redacted in the police reports, and which the government has refused to reveal[2]—did not take down a license plate number and could not see anyone in the car. There is no surveillance footage that would enable identification of the vehicle or anyone in the car. As to the Castro Valley shooting, there is no indication that a similar car was involved and there is nothing else other than the casing manufacturer and date to suggest any link. Again, no forensics, ballistics, or even photographs that suggest a connection. In addition, it is apparent from the government's heavily redacted discovery that law enforcement did track down some of the individuals involved in the Castro Valley shooting, searched a cell phone belonging to one of them, and obtained search warrants for carrier records from T-Mobile, and pen trap and trace information from Sprint for one of the targets, as well as surveillance video related to the event. It

---

[2] Should the Court consider denying Mr. Jefferson's bid for bail, he moves for immediate unsealing of all of the redacted materials in the police reports concerning these other incidents. He also reserves the right to seek additional relief against the government for its failure to comply promptly with its discovery and ethical obligations, while he remains in custody.

DEFENDANT'S OPPOSITION
*JEFFERSON*, CR 19–00653 JD

11

also appears that an arrest warrant issued for one of the targets. Despite this mountain of evidence, the government is unable to produce any concrete, direct evidence linking Mr. Jefferson to this episode or the people it has apparently already identified as responsible. Incapable of making the required evidentiary showing, it instead points to generalized statistics about the increase in recent shootings around the Bay Area, which have no relation to Mr. Jefferson.

In sum, Mr. Jefferson is not a safety risk—and certainly not while he is sitting at home under the watchful eyes of his family. Magistrate Judge Corley placed him on strict conditions, and his recent track record since the April arrest demonstrates conclusively that he is in control, taking care of himself, and contributing productively to his family and his community. The government has had many months to investigate Mr. Jefferson, adduce evidence, and charge him with whatever crimes it believes it can prove. It has come up short on every score. Ultimately, it is the government's burden to prove dangerousness by clear and convincing evidence, and its showing in this case does not come even close to passing muster. Mr. Jefferson should be released according to the terms of the bond issued by Magistrate Judge Corley.

**II.    Mr. Jefferson has never missed a court date, is not a credible flight risk, and his sureties and live-in custodian, coupled with lockdown, will ensure he appears for all court dates.**

The government does not appear to argue that Mr. Jefferson is a flight risk, and for good reason. He has never missed a court date in his life. He was released on own recognizance by the Superior Court, and he has made a half a dozen state court dates since April and stayed in contact with his state defense counsel. He has never suffered a bench warrant for failure to appear. He remains in touch with his probation officer, who reports he is in good standing. Portman Decl. ¶ 5. Mr. Jefferson has a steady job, and a supportive family. He does not suffer from serious mental health conditions or substance abuse that might interfere with his ability to make court dates. He has no travel documents or assets to flee, has lived his entire life in Northern California, and has never travelled. PT at 3. Most importantly, he enjoys a romantic relationship and family ties here. As a practical matter, since he will be on lockdown at his family's apartment, he will not even need to leave the residence to attend court dates by Zoom or telephone during the remainder of the public health crisis. In view of all this, there can be no serious question that Mr. Jefferson is not a flight risk,

*JEFFERSON*, CR 19–00653 JD

12

or at least that the strict conditions imposed by Magistrate Judge Corley are more than sufficient to ensure his appearance at all future dates.

### III. Mr. Jefferson's father is an excellent surety and custodian, as Magistrate Judge Corley correctly found after questioning him.

The government launches a meritless attack on Mr. Jefferson's father as an inadequate surety and custodian, due to the fact that he has several prior convictions—all of which are 15 to 25 years old. PT at 2. This Court routinely accepts sureties with stale criminal history if they are otherwise suitable. Indeed, it is quite common for the Court to accept sureties with much more recent criminal history, provided they offer sufficient moral suasion over the defendant. Here, Mr. Jefferson easily meets that criteria and Magistrate Judge Corley rightfully and quickly rejected any suggestion that either surety was inadequate and the government hardly (if at all) even argued this point below. Instead, she correctly pointed out that rehabilitated convicts often are best suited to supervising defendants because of the insight and experience they have gained. Rizk Decl., Ex. D at 11:02 (Magistrate Judge Corley: "I mean, it's old enough that it would be – it's ok. Sometimes actually, people who've had contact with the criminal justice system are the best people, right, because they can tell Mr. Jefferson, this is crazy, you've got to stop this, right, you've got to turn things around."). The government further objects that Mr. Jefferson did not reveal his criminal history to Pretrial Services when asked. Again, this is a very routine occurrence in bail investigations, and typically *not* an indication of a lack of candor. Neither the case law nor common sense supports the government's view. By contrast, Magistrate Judge Corley, reflecting her wealth of practical experience evaluating sureties, asked his father about this very issue during the bail hearing, and even correctly anticipated his response—namely, that he is used to revealing to employers any convictions that are seven or 10 years old, as required by California state law, and he assumed bail investigation process was no different. She acknowledged and accepted this explanation, which is again quite common in bail proceedings. Rizk Decl., Ex. D at 24:28 (Magistrate Judge Corley: "No, you are correct that for employment under California law, they're not allowed to ask for that. Alright, but, your record is old, and as I said to Mr. Rizk, I do believe that you perhaps, are maybe in the best position to make sure your son changes things around."). Both sureties are quite suitable, as Magistrate Judge Corley

DEFENDANT'S OPPOSITION
*JEFFERSON*, CR 19–00653 JD

13

correctly found.

### IV. Mr. Jefferson's severe asthma puts him at particular risk of serious illness or death should he contract COVID-19, which further counsels in favor of release.

Finally, the Court should consider Mr. Jefferson's asthma in connection with his request for bail. As the Court knows well, dozens and dozens of defendants have been released on bail and compassionate release during the COVID-19 public health crisis to alleviate conditions at the jail and safeguard their own health and lives. *See, e.g., United States v. Youn*, 2020 WL 4465452 (N.D. Cal. Aug. 4, 2020). Asthma, of course, is a chronic disease in which the airways into and out of the lungs are inflamed.[3] Symptoms include "wheezing, coughing, chest tightness and trouble breathing – especially early in the morning or at night. In a severe asthma attack, the airways close so much that other vital organs in the body do not get enough oxygen." *Id.* According to the CDC, people with moderate-to-severe asthma can have an increased risk of contracting a severe case of COVID-19.[4] A person has "moderate persistent asthma" if any of the following are present *before treatment*: daily symptoms, symptoms that interfere with daily activities, night time symptoms more than once per week, or abnormal lung function tests.[5] A person has "severe persistent asthma" if, *without treatment*, any of these symptoms occur throughout each day or severely limit daily physical activities. *See id.* The CDC also recommends that those who suffer from moderate to severe asthma should: "[k]eep your asthma under control," "[c]ontinue your current medications, including inhalers …" and "don't stop any medication or change your asthma treatment plan."[6]

Although this issue should be beyond reasonable dispute, the government argues that "Jefferson presented no evidence that he suffers from moderate to severe asthma" as opposed to mild

---

[3] *See* American Academy of Allergy Asthma & Immunology, *Asthma Definition*, available at https://www.aaaai.org/conditions-and-treatments/conditions-dictionary/asthma (last accessed Dec. 2, 2020).
[4] *See* CDC, *People at Increased Risk for Severe Illness* (hereinafter "*Increased Risk*"), http://www.cdc/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed Dec. 2, 2020).
[5] *See* University of Michigan, *Classification of Asthma,* available at https://www.uofmhealth.org/health-library/hw161158 (last accessed Dec. 2, 2020).
[6] *See* CDC, Coronavirus Disease 2019 (COVID-19), People with Moderate to Severe Asthma, at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last accessed Dec. 2, 2020).

DEFENDANT'S OPPOSITION
*JEFFERSON*, CR 19–00653 JD

asthma. This quibble is incorrect and remarkable given the government's own failure to put anything in the evidentiary record.[7] In fact, the Pretrial Services Report is itself verified evidence: "He further informed he has asthma and has trouble breathing at night. He informed he has an inhaler at home but no other medication." PT at 5. *See, e.g., U.S. v. Robinson,* 733 F. Supp. 280 (N.D. Ill. 1990) (Pretrial Services Report is evidence). On top of the Pretrial Service Report, Mr. Jefferson and his father also appeared in court to confirm before the magistrate court that he suffers from severe asthma, had difficulty breathing at night, and needs an inhaler. Further, there is no dispute that Mr. Jefferson has not received an inhaler while in custody, despite difficulty breathing. Rizk Decl. ¶ 5. Nor is there any debate that Santa Rita Jail has had hundreds of cases of COVID-19.[8] The government's assertion that Mr. Jefferson's football career in high school, while was using an inhaler, demonstrates he does not have severe asthma now, is absurd and not supported by any evidence in the record. Magistrate Judge Corley correctly gave this argument short shrift, despite the government's efforts to manufacture an issue out of it, commenting: "There is one thing we know, is that asthma is big risk factor for serious complications for COVID-19. That is not debatable, that is in fact clear." Rizk Decl., Ex. D at 12:52.

This is not a capital case, and Mr. Jefferson's health and life may depend on escaping a custodial environment that is rife with COVID-19, to which he is particularly vulnerable. The current crisis also militates strongly in favor of release.

## CONCLUSION

Mr. Jefferson respectfully asks the Court to uphold Magistrate Judge Corley's decision to release him on a $50,000 bond signed by his mother and father (as custodian) and require him to shelter-in-place at home with his family until further court order.

---

[7] It is a truly remarkable argument from the government, given that the government itself failed to provide Pretrial Services with any information whatsoever about the shootings it discusses in its motion, and also neglected to attach a single document to the government's two motions for detention concerning those incidents. Without a single piece of evidence in the record, it is hard to see how the government could possibly think it has sustained its burden in this matter.

[8] Alameda County Sheriff's Office, COVID-19 Update, https://www.alamedacountysheriff.org/admin_covid19.php (last accessed Dec. 2, 2020).

DEFENDANT'S OPPOSITION
*JEFFERSON*, CR 19–00653 JD

1
2      Dated:    December 2, 2020                    Respectfully submitted,
3
                                                     STEVEN G. KALAR
4                                                    Federal Public Defender
                                                     Northern District of California
5
                                                             /S
6                                                    DAVID W. RIZK
                                                     Assistant Federal Public Defender
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANT'S OPPOSITION
*JEFFERSON*, CR 19–00653 JD

16